UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EARNEST SCOTT, JR., <br><br> Plaintiff <br><br> v. <br><br> PENNSYLVANIA DEPARTMENT OF CORRECTIONS, *et al.* <br><br> Defendants. | CIVIL ACTION NO. 3:24-CV-00335 <br><br> (MEHALCHICK, J.) |

**MEMORANDUM**

Presently before the Court are two motions to dismiss the amended complaint filed by *pro se* Plaintiff Earnest Scott, Jr.'s ("Scott"). (Doc. 40; Doc. 41). Also pending is Scott's motion to voluntarily dismiss Defendant Jessica Tress ("Tress") as a party to this action. (Doc. 51). The Court will grant both Scott's motion and Defendant Tress' motion and dismiss all claims against Defendant Tress. The Court will grant the remaining Defendants' motion to dismiss in part and deny in part.

**I.   BACKGROUND AND PROCEDURAL HISTORY**

On February 27, 2024, the Court received and docketed a complaint from Scott, an inmate at the State Correctional Institution in Albion, Pennsylvania ("SCI-Albion") against twenty-nine defendants, pursuant to 42 U.S.C. § 1983. (Doc. 1). Scott filed an uncertified motion to proceed *in forma pauperis* on February 29, 2024. (Doc. 4). Following an Administrative Order requiring a filing fee or a certified motion to proceed *in forma pauperis*, Scott filed a certified motion to proceed *in forma pauperis* on March 7, 2024. (Doc. 7).

On May 1, 2024, the Court granted Scott's motion to proceed *in forma pauperis* in this action and screened the complaint pursuant to 28 U.S.C. § 1915A. (Doc. 12; Doc. 13). The

remaining claims included the Americans with Disabilities Act ("ADA") claim against the Pennsylvania Department of Corrections ("DOC"), the First Amendment retaliation claim against eleven Defendants, the Eighth Amendment excessive use of force claims against the eight John Doe Defendants, and the Fourteenth Amendment due process claim against one defendant. (Doc. 13). The Court granted Scott leave to file an amended complaint. (Doc. 13).

The Court received and docketed Scott's amended complaint on May 13, 2024. (Doc. 14; Doc. 18). Subsequently, the Court received and docketed Scott's motion to again amend his complaint. (Doc. 26.) On September 6, 2024, the Court determined that Scott was within the period set forth in Fed. R. Civ. P. 15(a)(2) to amend his complaint and granted the motion. (Doc. 32.)

In the second amended complaint, names 37 defendants: (1) the DOC; (2) Laurel R. Harry ("Harry"), the Secretary of Corrections employed by the DOC in her official capacity; (3) Robert Gimble ("Gimble"), Deputy for Intuitional Operations employed by the DOC in his official capacity; (4) John Rivello ("Rivello"), a Corrections Superintendent 3 employed by the DOC at SCI-Huntingdon in his official capacity; (5) Jon Kohler ("Kohler") a Deputy Superintendent for Facility Management employed by the DOC at SCI-Huntingdon in his official capacity; (6) Jill Spyker ("Spyker"), a Deputy for Centralized Services employed by the DOC at SCI-Huntingdon in her official capacity; (7) W. House ("House"), a Major o the Guard employed by the DOC at SCI-Huntingdon in his official capacity; (8) C. Lay ("Lay"), a Major for Unit Management employed by the DOC at SCI-Huntingdon in her official capacity; (9) Tim Strait ("Strait"), a Correction Classification manager PREA compliance Manager employed by the DOC at SCI-Huntingdon in his official capacity; (10) Sean McCorkle ("McCorkle"), a Corrections Health Care Administrator employed by the DOC at

2

SCSI-Huntingdon in his official capacity; (11) Scott Ellenberger ("Ellenberger"), a Hearing Examiner employed by the DOC at SCI-Huntingdon in his official and individual capacities; (12) Henry, a Corrections Officer 4/Captain employed by the DOC at SCI-Huntingdon in her official and individual capacities; (13) Beish, a Unit Manager of Alpha Block at SCI-Huntingdon in his official and individual capacities; (14) Anthony Miller ("Miller"), a Correctional Officer 3/Lieutenant employed by the DOC at SCI-Huntingdon in his official and individual capacity; (15) Lamberson, Sargent/Corrections Officer 2 employed by the DOC at SCI-Huntingdon in her official and individual capacities; (16) Johnson, Sargent/Correctional Officer 2 employed by the DOC at SCI-Huntingdon in his official and individual capacities; (17) Stoltzfus, a Correctional Officer 1 employed by the DOC at SCI-Huntingdon in his official and individual capacities; (18) Laborde, a Correctional Officer 1 employed by the DOC at SCI-Huntingdon in his official and individual capacities; (19) Weakland, a Corrections Officer 1 employed by the DOC at SCI-Huntingdon; (20) Wilt, a Corrections Officer 1 employed by the DOC at SCI-Huntingdon in his official and individual capacities ; (21) Croft, a Corrections Officer 1 employed by the DOC at SCI-Huntingdon in his official and individual capacities; (22) Mosely, a Corrections Officer 3 employed by the DOC at SCI-Huntingdon in his official and individual capacities; (23) McCaulley, a Corrections Officer 1 employed by the DOC at SCI-Huntingdon in his official and individual capacities; (24) Renninger, a Corrections Officer 1 employed by the DOC at SCI-Huntingdon in his official and individual capacities; (25) Suydam, a Corrections Officer 1 employed by the DOC at SCI-Huntingdon in his official and individual capacities; (26) John/Jane Doe 1, 2, and 3, who are Corrections Officer 1 employed by the DOC at SCI-Huntingdon in their official and individual capacities; (27) Scott Klinefelter ("Klinefelter"), a Corrections

Superintendent 3 at SCI-Houtzdale in his official capacity; (28) Michelle Ivicic ("Ivicic"), a Deputy Superintendent at SCI-Houtzdale in her official capacity; (29) Jon Altenus ("Altenus"), a Corrections Health Care Administrator employed by the DOC at SCI-Houtzdale in his official capacity; (30) Emigh, a Corrections Officer 1 employed by the DOC at SCI-Huntingdon in his individual capacity; (31) Erica Benning ("Benning"), Director for the Bureau of Health Care Services employed by the DOC at Central Office in her official capacity; (32) Tiffany Frackler ("Frackler"), ADA Coordinator employed by the DOC at the Central Office in her official capacity; (33) Erin Brown, ("Brown") from the Office of Population Manager employed by the DOC at Central Office in her official capacity; (34) Sean Bresnahan ("Bresnahan"), Licensed Psychologist Manager employed by Correct Care Solutions in his official and individual capacities; and (35) Jessica Cousins ("Tress")[1], a certified Registered Nurse Practitioner employed by the DOC at SCI-Huntingdon in her official and individual capacities. (Doc. 33, at 2-10).

In the second amended complaint, Scott alleges that he was seen by the Psychiatric Review Team ("PRT") consisting of Defendant Bresnahan and non-parties Ryan Edwards and Matthew Fetsko on December 11, 2023. (Doc. 33, at 10). He alleges that he was informed that he was being downgraded from a D-code stability to a C-code stability. (Doc. 33, at 10). Scott states that this downgrade was done without a mental health evaluation and when he informed Ryan Edwards of this, Defendant Bresnahan stated "Mr. Scott we don't need to do another Evaluation on you!! When you're seen by a Psych Doctor, and tell them you're good on your Meds that is your Evaluation End of Discussion!!" (Doc. 33, at 10). Scott alleges that

---

[1] In recent filings, this defendant has corrected her name to Jessica Tress. (Doc. 40).

4

there was no kind of inter-active process done by Defendants DOC, Bresnahan, Ivicic, and Klinefelter that is required by the "ADA/RA Title II." Doc. 33, at 11). Scott further alleges that upon his arrival at SCI-Huntingdon, he was seen by PRT member Defendant Tress on January 23, 2024 and he reported to Defendant Tress that he was downgraded to C-code out of retaliation for filing lawsuits and grievances at SCI-Houtzdale regarding his mental health needs not being met. (Doc. 33, at 11). Scott states that prior to leaving SCI-Houtzdale, he submitted an ADA Accommodations Form to Defendant Altemus requesting to be reevaluated and accommodated for a D-code stability, but Defendant Altemus did not "adequately undergo" an inter-active process to see how to best accommodate his mental and physical disability. (Doc. 33 at 11-12). Scott states that Defendant Altemus is subjecting him to discrimination, differential treatment, and disparate treatment by reasons of his mental and physical disability and he is retaliating against him due to a pending civil suit against him. (Doc. 33, at 12).

Scott also alleged that he submitted a second ADA Accommodations Form with Defendant McCorkle on January 29, 2024. (Doc. 33, at 12). Scott requested that his type 1 diabetes be accommodated with Accu-Chek's and insulin four times a day and two 500 calorie snack bags twice a day, and daily exercise. (Doc. 33, at 12). Because his accommodations have not been granted, Scott states that his hemoglobin and his diabetic neuropathy to get worse and worse every six months to one year. (Doc. 33, at 12). Scott further alleges that on February 15, 2024, non-party Nurse Supervisor Kirck Rolland came to his cell door with the results of Scott's ADA Accommodation requests submitted on January 29, 2024 and alleged that it was denied without any inter-active process. (Doc. 33, at 12).

Based on these alleged facts, He makes the further allegation that Defendants McCorkle, Altemus, Bresnahan, Ivicic, Spyker, Klinefelter, Rivello, Benning, Frackler, Brown, and Gimble was and still is denying/excluding his benefits of services, programming, and activities of a public entity by reasons of his disabilities to which he is being subjected to differential treatment, disparate treatment, and discrimination by reasons of his mental and physical disability in violation of the "ADA/RA Tile II." (Doc. 33, at 13).

Scott further alleges that he was told he would be placed in general population upon his arrival to SCI-Huntingdon. (Doc. 33, at 15). Scott states that on January 30, 2024 at 4:30 p.m., dinner trays were being served and his blood sugar dropped. (Doc. 33, at 15). Scott's cellmate attempted to get his food tray, and was refused by the block worker. (Doc. 33, at 15). His cellmate then asked Defendant Lamberson to call medical, and Defendant Lamberson allegedly refused. (Doc. 33, at 15). Scott then allegedly wrote a request to staff to Defendants Beish and Loy concerning the January 30, 2024 incident, and the Defendants "concurred" with Defendant Lamberson's conduct. (Doc. 33, at 16).

Scott also alleges that on February 8, 2024, he overheard his cellmate ask Defendants Welt, Weakland, and Johnson for a grievance, and both Defendants Wilt and Weakland stated that Scott and his cellmate were "barking up the wrong tree" by filing grievances and lawsuits. (Doc. 33, at 17). Scott states that he then wrote a request to staff to Defendants Loy and Beish "about issues he was having on First and Second shifts, but he's not rectifying these issues." (Doc. 33, at 17.) Defendant Loy then allegedly "concurred" with Defendant Beish by forwarding the request slip to him on February 9, 2024. (Doc. 33, at 17). Scott alleges that the next day, Defendant Stoltzfus retaliated against him while he was "Engaged in a Protected conduct against the whole <u>second</u> and <u>First</u> shift, but utilizing a DC-141 misconduct on Mr.

6

Scott based on 'FALSE PRETENSES.'" Defendant Miller asked Scott to cuff up to be taken to the security level five housing unit. (Doc. 33, at 17). Scott than states that he and Defendant Miller knew each other from SCI-Houtzdale. (Doc. 33, at 17-18.) Scott states that he was then restrained and taken to security level 5 housing unit by Defendant McCaulley. (Doc. 33, at 18). Scott alleges that he then passed out due to his blood sugar dropping, and when he woke up, people were carrying him, and he did not know what was going on. (Doc. 33, at 18). Scott then started screaming, and he was slammed on to the ground causing injury to the left side of his face. (Doc. 33, at 18). Scott alleges Defendants McCaulley, Suydam, Renniger, Miller, and John Does 1, 2, and 3 aided and abetted in the use of excessive force in violation of the Eighth Amendment. (Doc. 33, at 18). When Scott was placed in the Psychiatric Observation Cell, he began banging his head on the cell door, and Defendant Renniger threatened to use OC spray in violation of Scott's Eighth Amendment rights. (Doc. 33, at 18-19).

On February 13, 2024, Scott was released from the Psychiatric Observation Cell and was seen by Defendant Ellenberger who said he would give him time in the Restricted Housing Unit ("RHU"). (Doc. 33, at 19.) When Scott asked how he could give him time in the RHU without hearing his side of the story, Scott alleges that Defendant Ellenberger stated "Because I work here! And I'm pretty close with All staff that works here! And if they say you did what was written on this misconduct, then you did it!!" (Doc. 33, at 19). Scott alleges he Defendant Ellenberger coerced him by threatening a longer sentence in RHU if he did not plead guilty to the charges. (Doc. 33, at 19-20). Scott states this violated his Fourteenth Amendment. He further alleges that Defendant Ellenberger conspired to retaliate against him with Defendants Stoltzfus, Laborde, Lamberson, Wild, Weakland, Loy and Beish in sanctioning Scott to thirty days in the RHU. (Doc. 33, at 20).

7

Scott alleges that Defendant Laborde was assigned to work on the RHU and threatened to make his life difficult if Scott did not sign off on the grievance he put in on Defendants Laborde, Lamberson, and Stoltzfus. (Doc. 33, at 20). Scott also alleges that Defendant Emigh threated him and called him derogatory names. (Doc. 33, at 20-21).

Scott alleges that on June 15, 2024 at around 10:30 a.m., lunch trays were collected and Defendant Emigh approached his cell door using sexually derogatory statements and threatened to teach him a lesson because of the grievances and lawsuits he filed. Scott states this violated his First Amendment Rights as they constitute sexual harassment, campaign harassment, and retaliatory conduct. (Doc. 33, at 21).

Scott alleges that Defendant Croft caused him and his cellmate to miss yard on April 12, 2024 in violation of his rights under the "ADA/RA Title II" and intentional infliction of emotional distress. (Doc. 33, at 21-22).

Scott states that on July 2, 2024 at around 5:30 p.m., Defendants McCaulley and Suydam aided and abetted on using excessive force against him by deploying OC spray into his cell without reason and Lieutenant Mozely ("Mosely")[2] failed to intervene in violation of Scott's Eighth Amendment rights. (Doc. 33, at 22). Scott also alleges that on that same day, Defendants McCaulley and Suydam refused to follow the doctor's order by not going to the kitchen to get his second same back, that he was written up by Defendant McCaulley for refusing to obey an order, and Defendant McCaulley alleged that Scott refused multiple orders to uncover his cell door with a towel. (Doc. 33, at 22). Scott alleges that he did not cover himself with a towel, but was found guilty to this misconduct on July 8, 2024. (Doc. 33

---

[2] The Court assumes that Lieutenant Mozely is Defendant Mosely because no "Mozely" is identified as a party.

at 23). Scott alleges that Defendant Ellenberger violated his Fourteenth Amendment rights by not allowing him the opportunity to present evidence to substantiate that he had not covered up. (Doc. 33, at 23).

Scott's prayer for relief includes injunctive monetary, and punitive relief. (Doc. 33, at 28).

Scott alleges that he has written multiple letters to Defendant Harry of all the misconduct incidents and that she acquiesced in the misconduct incidents by failing to rectify them. (Doc. 33, at 23).

On October 28, 2024, the Defendants who were served entered motions to dismiss the second amended complaint. (Doc. 40; Doc. 41.)

**II.** Rule 12(B)(6) Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions which are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the required elements which make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not

entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions' . . . ." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). Nor need a court assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

Additionally, Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Thus, a well-pleaded complaint must recite factual allegations that are sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation, set forth in a "short and plain" statement of a cause of action. There is no requirement that the pleading be specific or probable. *Schuchardt*, 839 F.3d at 347 (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, at 233-234 (3d Cir. 2008). Rule 8(a) requires a "showing that 'the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (quoting Fed. R. Civ. P. 8(a)(2)); *see also Phillips*, 515 F.3d at 233 (citing *Twombly*, 550 U.S. at 545).

With the aforementioned standards in mind, a document filed pro se is "to be liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). Further, the Third Circuit has instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

**III. DISCUSSION**

In his second amended complaint, Scott raises claims under the ADA, the Rehabilitation Act ("RA"), the Eighth Amendment, the First Amendment, and the Fourteenth Amendment. (Doc. 33).

11

A. ADA/RA Claims

In the previous screening order, the Court focused on the ADA and RA claims, which it deemed Scott had failed to state a claim for which relief may be granted. (Doc. 12; Doc. 13). Specifically, it dismissed all ADA and RA claims brought against individuals with prejudice. (Doc. 13). Therefore, any ADA/RA claims raised against Defendants in their individual capacities in the second amended complaint are dismissed without prejudice.

Scott again raises claims under Title II of the ADA and the RA against the DOC and eighteen individuals in their official capacity premised on two alleged disabilities: (1) mental health disorders and (2) Type 1 Diabetes. (Doc. 33, at 25). Because Scott is suing Defendants in their official capacities, such claims may be viable as the Supreme Court has held that Title II of the ADA validly abrogates sovereign immunity as to state conduct that violates the Constitution. *United States v. Georgia*, 546 U.S. 151, 159 (2006); *see also Durham v. Kelley*, 82 F.4th 217, 224 (3d Cir. 2023) ("state officers *can* be sued for damages in their official capacities for purposes of the ADA and RA, unless barred by the Eleventh Amendment") (emphasis in original).

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a claim under Title II of the ADA, a plaintiff must allege that: "(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *McPherson v. County of Dauphin*, No. 19-1865, 2020 WL 1558206, at *2 (M.D. Pa. Mar. 24, 2020). The RA

requires the same showing but applies only to "any program or activity receiving Federal financial assistance" and requires a plaintiff to demonstrate that their disability was the sole reason for the discrimination, not merely one reason. 29 U.S.C. § 794(a); *CG v. Pa. Dep't Educ.*, 734 F.3d 229, 235-36 (3d Cir. 2013).

Scott is basing his ADA and RA claims on the fact that he was downgraded from a D-code stability to a C-code stability and on the refusal to provide him Accu-Cheks and snacks at the rate he requests. (Doc. 33).

### 1. Downgrade from D-code Stability

Presuming that Scott's mental illness is a qualifying disability, he has not pled facts demonstrating that he has been precluded from any program, service, or activity because of his disability. Scott objects to the loss of his "D-code" status, but the facts in the complaint allege that the change in status was done in retaliation for filing grievances and civil complaints against Defendants concerning his disability. (Doc. 33). Scott does state that he is being denied/excluded from benefits of services, programming and activities of a public entity by reasons of his disabilities and is being subject to differential treatment, disparate treatment, and discrimination by reasons of his mental and physical disabilities, but these general allegations are not supported by his factual allegations. (Doc. 33, at 13). Scott's factual allegations repeatedly state that the D-status stability was downgraded in retaliation for his grievances. (Doc. 33). Therefore, Scott cannot meet the causation required under the ADA or the RA.

Scott further alleges that various defendants ignored his requests for "ADA accommodations," and failed to engage in an "inter-active process" to find reasonable accommodations. Neither the ADA nor the RA requires an "inter-active process"; that term

13

is typically used in the employment context as one way to determine whether an employee with a disability can work for a particular employer. *See Shapiro v. Twp. of Lakewood*, 292 F.3d 356, 359 (3d Cir. 2002) (citing 29 C.F.R. § 1630.2(o)(3)).

### 2. Diabetic Accommodations Claims

Turning to Scott's alleged disability based on Type 1 Diabetes and the denied accommodations, the Court highlights that the requested accommodations are akin to medical treatment and not accommodations under the ADA. "[D]ecisions about a prisoner's medical treatment generally do not give rise to a claim under the ADA." *Nunez v. Prime Care Health, Inc.*, No. 19-CV-859, 2019WL1400466, at*1n.3 (E.D. Pa. Mar. 27, 2019) (collecting cases). Here, Scott's claims would inevitably fail because the ADA and RA "prohibit[ ] disability-based discrimination, 'not inadequate treatment for the disability.'" *Kokinda v. Pennsylvania Dep't of Corr.*, 663 F. App'x 156, 159 (3d Cir. 2016) (quotation omitted). Medically required diets and routine blood sugar checks are akin to medical treatment and not evidence of discrimination. Therefore, the ADA and RA claims raised against Defendants based on the denial of his requested accommodations for additional snacks and routine blood sugar checks will be dismissed.

### B. FIRST AMENDMENT CLAIMS

Defendants only challenge the retaliation claims against Defendants Croft and Emigh. (Doc. 45, at 19-20).

It is well-settled that prison officials may not retaliate against an inmate because he exercises his right of access to the courts. *Fantone v. Latini*, 780 F.3d 184, 191 (3d Cir. 2015). A prisoner asserting a retaliation claim must allege the following elements: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a

person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *see also Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). The filing of a lawsuit or a prison grievance constitutes protected activity under the First Amendment. *Fantone*, 780 F.3d at 191.

### 1. Defendant Croft

Scott alleges that Defendant Croft caused him and his cellmate to miss yard on April 12, 2024. (Doc. 33, at 21-22). He alleges that Defendant Croft violated his First Amendment rights against retaliation. (Doc. 33, at 25-26). The Third Circuit has held that a single denial of access to the exercise yard does not rise to the level of adverse action under the First Amendment. *Burgos v. Canino*, 358 F. App'x 302, 306 (3d Cir. 2009). Indeed, in *Coit v. Garman*, the Court held that the loss of even three periods of yard time was *de minimis*. No. 1:17-CV-1438, 2019 WL 2612703 at *9 (M.D. Pa. June 26, 2019), aff'd, 812 F. App'x 83 (3d Cir. 2020). Therefore, the First Amendment claim against Defendant Croft is dismissed without prejudice.

### 2. Defendant Emigh

Scott alleges that Defendant Emigh verbally harassed him by using sexually derogatory statements, and these statements violated his First Amendment rights to be free of retaliation. (Doc. 33, at 21).

Verbal harassment may be sufficiently adverse to support a retaliation claim if the plaintiff has been subjected to "an entire campaign of harassment which though trivial in detail may have been substantial in gross." *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000). But isolated incidents of verbal retaliation were a non-recurring incident and are not

sufficiently adverse actions to support a retaliation claim. *See Burgos*, 358 F. App'x at 306 (noting that isolated verbal threats do not constitute retaliation); *see Green v. Wetzel*, 2019 WL 1426955, at *8 (W.D. Pa. Mar. 29, 2019) ("Because verbal threats and comments are not adverse actions, Santos' sarcastic comments during Plaintiff's meeting are not actionable") (citing *Chruby v. Kowaleski*, 534 Fed. App'x. 156, 161 (3d Cir. 2013)).

Here, Scott alludes to a campaign of harassment, but only cites to a single event of verbal harassment. (Doc. 33, at 21). Therefore, the court will dismiss the First Amendment retaliation claims against Defendant Emigh without prejudice.

C. EIGHTH AMENDMENT USE OF EXCESSIVE FORCE CLAIMS

Scott alleges that Defendants McCaulley, Suydam, Renniger, Miller, and John Does 1, 2, and 3 violated his Eighth Amendment Rights through the use of excessive force. (Doc. 33, at 26). Defendants only challenge the claims raised against Defendants McCulley, Suydam, and Mosely. (Doc. 45, at 18).

The Eighth Amendment's protection against cruel and unusual punishment is the "primary source of substantive protection in cases ... where the deliberate use of force is challenged as excessive and unjustified." *See Whitley v. Albers*, 475 U.S. 312, 327 (1986). The question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7, (1992) (citing *Whitley*, 475 U.S. 312).

Scott alleges that Defendants McCulley and Suydam used OC Spray against Scott in his cell on July 2, 2024 and Mosely failed to intervene. (Doc. 33, at 22). Scott alleges little else in the way of facts surrounding the use of OC Spray other than the assertion that it was unlawful, unjustifiable, and done with no legitimate penological justifications. (Doc; 33, at

22). Based on the alleged facts, the Court will not grant Defendants' motion to dismiss and will allow the excessive force claims and the failure to intervene claim to proceed to discovery.

### D. EIGHTH AMENDMENT SEXUAL HARASSMENT CLAIMS

Scott raises Eighth Amendment sexual harassment claims against Defendant Emigh. (Doc. 33, at 26).

It is well-settled that the use of words, no matter how violent, is not actionable under 42 U.S.C. § 1983. *See Marten v. Hunt*, 479 Fed.Appx. 436 (3d Cir. 2012); *Lewis v. Wetzel*, 153 F.Supp.3d 678 (M.D. Pa. 2015); *see also Harris v. Ferguson*, 3:16-cv-1965, 2017 WL 3611752, at *4-5 (M.D. Pa. Aug. 22, 2017) (granting summary judgment to defendants on § 1983 claims regarding verbal sexual harassment because the record did not show that plaintiff suffered injury or damage); *Maclean v. Secor*, 876 F. Supp. 695, 698-99 (E.D. Pa. 1995) ("It is well established that verbal harassment or threats will not . . . without some reinforcing act accompanying them, state a constitutional claim.").

Scott alleges that Defendant Emigh used sexually explicit language against him, but nothing else. (Doc. 33, at 21). Therefore, the second amended complaint fails to allege an Eighth Amendment claim against Defendant Emigh, and the claim will be dismissed without prejudice.

### E. MOTION TO VOLUNTARILY DISMISS DEFENDANT TRESS

Scott moved to voluntarily dismiss Defendant Tress stating that she lacks personal knowledge and personal involvement in the ADA/RA claim against her. (Doc. 51). The Court will grant Scott's motion to dismiss Defendant Tress as a party and grant Defendant Tress' motion to dismiss.

## IV. CONCLUSION

The Court will grant Scott's and Defendant Tress' motions to dismiss. (Doc. 40; Doc. 51). All claims against Defendant Tress will be dismissed. The Court will likewise grant, in part, the remaining Defendants' motion to dismiss. (Doc. 41). All ADA and RA claims against Defendants in their official capacities will be dismissed without prejudice. The First Amendment retaliation claims against Defendant Croft and Emigh will be dismissed without prejudice. The Eighth Amendment claims against Defendant Emigh will be dismissed without prejudice. The remaining claims include First Amendment retaliation claims against Defendants Lay, Ellenberger, Beish, Miller, Lamberson, Johnson, Stoltzfus, Labarde, Weakland, Wilt, McCaulley, and Suydam, Eighth Amendment use of excessive force claims against Defendants Miller, McCaulley, Renninger, Suydam, and John Does 1, 2, and 3, and Fourteenth Amendment claims against Defendant Ellenberger. The Court notes that Scott did not include claims against Defendant Henry in his second amended complaint despite naming her as Defendant. (Doc. 33). Therefore, there are no current claims pending against Defendant Henry.

Considering this is Scott's second amended complaint, and the Court has allowed him a prior opportunity to file a curative complaint, the Court will not permit a curative amended pleading as a matter of course. *Grayson*, 293 F.3d at 108.

An appropriate Order follows.

Dated: August 4, 2025                                    s/ *Karoline Mehalchick*
                                                         **KAROLINE MEHALCHICK**
                                                         **United States District Judge**